FABRIQUE DE FER DE CHARLEROI S.A., Plaintiff,

v.

UNITED STATES of America and the United States Department of Commerce, Defendants,

and

Geneva Steel et al., Intervenor-Defendants.

Slip Op. 98-4.
Court No. 93-09-00600-AD.

United States Court of International Trade.

Jan. 16, 1998.

Barnes, Richardson & Colburn (Gunter von Conrad and Peter A. Martin) for plaintiff.

Frank W. Hunger, Asst. Atty. Gen.; David M. Cohen, Director, Velta A. Melnbrencis, Asst. Director, Commercial Litigation Branch, Civil Division, U.S. Dept. of Justice; Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce (Elizabeth C. Seastrum), of counsel, for defendants.

1. See 58 Fed.Reg. 37,083 (July 9, 1993).

2. There being no indication to the contrary, the court deems this approach to be an abandon-

Dewey Ballantine (Alan Wm. Wolff and Michael H. Stein), Skadden, Arps, Slate, Meagher & Flom (Robert E. Lighthizer and John J. Mangan) for intervenor–defendants.

*Opinion & Order*

AQUILINO, Judge:

The above-named plaintiff ("Fafer" or "FFC") initially pleaded six causes of action herein, essentially that the International Trade Administration, U.S. Department of Commerce ("ITA") (i) unlawfully amended its final determination of sales of certain cut-to-length carbon steel plate from Belgium at less than fair value [1] based on an erroneous recalculation of Fafer's profit data, (ii) unlawfully rejected the model-match selection originally submitted by the company, (iii) unlawfully rejected FFC's clarification of the difference in merchandise adjustment information, (iv) incorrectly included the company's current yearly increase in its pre-pension provision in G & A expense for cost-of-production and constructed-value calculations, (v) unlawfully committed various additional substantive errors in its use of constructed value, cost of production and priceto-price sales, and (vi) unlawfully committed various additional computational and programming errors in its calculation of the weighted-average anti-dumping-duty margin assigned to Fafer. *See* Complaint, paras. 5–10.

## I

Subsequent to this pleading, counsel for the plaintiff were invited to present a motion for judgment on the agency record within the meaning of CIT Rule 56.2. And they have done so, albeit focusing only on the first alleged cause of action.[2] To quote from plaintiff's statement pursuant to Rule 56.2(c), the ITA

unlawfully amended its final determination based on an erroneous recalculation of Fafer's profit data. Evidence of record establishes that the profit experience of Fafer calculated on a weighted average basis is

ment of any claim to relief on any of the other grounds initially pleaded.

substantially lower than that derived by the [ITA]. This incorrect calculation ... substantially increased the margin percentage applied to Fafer in the [*Antidumping Duty Order and] Amendment to Final Determination of Sales at Less Than Fair Value: Certain Cut–to–Length Carbon Steel Plate From Belgium,* 58 Fed. Reg. 44,164 (August 19, 1993).

That increase was from 3.65 to 13.31. As explained in that amendment and now by the defendants, the petitioners before the agency alleged that it had

failed to use all of Fafer's reported profit data in the constructed value calculation for the class or kind of merchandise. The profit data allegedly not used was that for Fafer's "Z-type products," which had profit margins exceeding the eight percent statutory minimum....

"Z-type" steel refers to steel which has gone through special testing and for which the manufacturer supplies a certification guaranteeing the product's "through thickness," or Z-axis, characteristics.... During the investigation, Fafer contended that its U.S. sales of plate products were not of the Z-type, because they had not undergone the requisite testing and certification and, therefore, should not be compared to Fafer's home market sales of Z-type merchandise.... Petitioners contended the opposite.... Commerce agreed with Fafer.... Fafer did not then and does not now dispute that its Z-type products belong to the class or kind of merchandise covered by the investigation....

During the investigation, Commerce requested Fafer to supply average profit realized on home market sales *of the class or kind of merchandise.* ... Fafer failed to provide this information. Instead, initially, it provided cost of production information, from which profit data could be calculated for a limited number of home market sales and products, excluding the Z-type products.... Subsequently, Commerce requested, and Fafer supplied, cost of production information from which profit data could be calculated for Fafer's home market sales of the Z-type merchandise....

When Commerce recalculated Fafer's profit for its home market sales, including profit for the Z-type products, the result was a profit greater than the statutory minimum. Commerce then used the recalculated profit figure in recalculating constructed value. As a result, Fafer's estimated antidumping duty rate on plate increased substantially....

Defendants' Memorandum, pp. 3–4 (citations omitted; underscoring in original). Counsel for the intervenors claim, among other things, that the ITA calculated profit using all of the products for which Fafer reported data [3] and that

its proportional weighting of reported profit on Z-type products and non-Z-type products was proper given the record that Fafer itself created.

Defendant–Intervenors' Memorandum, p. 10 (footnote omitted).

The plaintiff responds that the agency unlawfully used the sampling of Z-type profit to account for a much greater percentage of home-market sales than the record reflects for that particular product; that the ITA unlawfully failed to base profit upon sales of comparable merchandise to the United States; and that it committed reversible error by disguising an unlawful amendment to its final determination as a correction of ministerial error. *See* Plaintiff's Reply *passim.*

II

The court's jurisdiction is pursuant to 28 U.S.C. §§ 1581(c), 2631(c), and its standard for review of the contested agency determination(s) is whether they are unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B); 28 U.S.C. § 2640(b).

A

Congress has adopted short periods of time within which the ITA must carry out its responsibilities, including issuance of final determinations under 19 U.S.C. § 1673d(a). Subsection (e) of that section 1673d provides that the ITA

---

**3.** *See* Defendant–Intervenors' Memorandum, p. 7.

establish procedures for the correction of ministerial errors in final determinations within a reasonable time after the determinations are issued under this section. Such procedures shall ensure opportunity for interested parties to present their views regarding any such errors. As used in this subsection, the term "ministerial error" includes errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like, and any other type of unintentional error which the [ITA] considers ministerial.

And the agency has established such procedures pursuant to this mandate,[4] including a definition of ministerial error essentially *in haec verba* the statute.

■ As indicated, the plaintiff claims a "substantive methodological change under the guise of a clerical error correction"[5] not contemplated by this statutory section, arguing that its last clause is

> limited to errors of the same general nature or kind as those connoted by the word "errors in addition, subtraction, or other arithmetic function, clerical errors resulting from inaccurate copying, duplication, or the like."

Plaintiff's Reply, p. 26. Of course, that clause covers "any other type of unintentional error" which the ITA "considers ministerial," but, even if plaintiff's position that this language "should not be read as a grant of unbridled discretion for Commerce to determine when an act is ministerial in nature"[6] is well-taken,[7] the court is not persuaded that the agency's approach was anything more than arithmetic. That is, from the beginning the methodology for which the ITA opted was to use constructed value for the foreign market, including profit, as prescribed by 19 U.S.C. §§ 1677b(a)(2) and (e). *Compare Notice of Preliminary Determinations of Sales at Less Than Fair Value and Postponement of Final Determinations: Certain Hot–Rolled Carbon Steel Flat Products, Certain Cold–Rolled Carbon Steel Flat Products, and Certain Cut–to–Length Carbon Steel Plate From Belgium,* 58 Fed.Reg. 7,075, 7,076 (Feb. 4, 1993), *with Final Determinations of Sales at Less Than Fair Value: Certain Hot–Rolled Carbon Steel Flat Products, Certain Cold–Rolled Carbon Steel Flat Products, and Certain Cut–to–Length Carbon Steel Plate From Belgium,* 58 Fed.Reg. 37,083, 37,084 (July 9, 1993). That approach did not change, only the profit calculation in regard thereto. And this court is unable to conclude that this kind of amendment, which admittedly can and did have material impact, is therefore violative of the ITA's authority under section 1673d(e), *supra.*

**B**

■ The record reflects Fafer sales of Z-type product in its home market but not in the United States during the period of agency investigation. Whereupon the plaintiff argues that

> basing profit upon sales of comparable merchandise to the United States by the individual producer under investigation remains the only authoritative method of deriving profit for purposes of the constructed value methodology.

Plaintiff's Reply, pp. 23–24, citing *Certain Electric Motors from Japan; Final Determination of Sales of Large Motors at Less Than Fair Value and Suspension of Investigation for Small Motors,* 45 Fed.Reg. 73,723 (Nov. 6, 1980). It claims to have been "compelled" to make this argument by defendants' contention herein that it agrees with ITA interpretation of the governing statute as requiring inclusion of profit realized on sales of the entire class or kind of home-market

---

4. *See* 19 C.F.R. § 353.28 (1993). This regulation provides for disclosure of and comment on ITA "calculations performed in connection with a final antidumping duty determination," which the record shows occurred in this matter.

5. Plaintiff's Reply, pp. 24–25.

6. *Id.* at 26.

7. But compare Webster's Third New International Dictionary of the English Language Unabridged (1993), which defines ministerial at page 1439 to mean, among other things, "of, being, or having the characteristics of an act or duty belonging to the administration of the executive function in government and specifically prescribed by law as part of the official duties of an office."

merchandise in constructing value, not just profit realized on the type of goods actually exported to the United States. *Compare id.* at 20 *with* Defendants' Memorandum, p. 8.

Whether the plaintiff really agrees with this contention or not,[8] it does admit that, in

the case at hand, both non Z-type and Z-type product comprise merchandise which is of the same general class or kind as the merchandise under consideration.

Plaintiff's Brief, p. 15. And the governing statute, 19 U.S.C. § 1677b(e)(1) (1993), provided that constructed value include

... **(B)** an amount for ... profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation, in the usual commercial quantities and in the ordinary course of trade, except that ...

(ii) the amount for profit shall not be less than 8 percent of the sum of ... general expenses and cost;....

*See also* 19 C.F.R. § 353.50(a)(2) (1993). Given the foregoing admission and language of the statute (and regulation based thereon), the plaintiff has little ground to argue that the focus of the ITA when considering profit should only have been on the merchandise it exported from the home market. That is, the court concludes that the agency's focus on profit on sales of the merchandise in the country of exportation is supported by substantial evidence and otherwise in accordance with law.

### C

■ Plaintiff's more pressing point is that that focus unlawfully skewed home-market profit and thus the margin of dumping in the United States. Its position has two alternative prongs, the first being that the ITA reject

any profit on home market sales of Z-type product and include in its profit calculation only sales of non Z-type product since non Z-type product sales comprise nearly ... [all] home market sales[,[9]]

or second, the

only other way to reach a fair and reasonable result in this instance is to read 19 U.S.C. § 1677b(e)(2)(B) as requiring that Commerce utilize a *proportional allocation of profit* that reflects the actual sales volume reported in the home market.

Plaintiff's Brief, p. 15 (emphasis in original).

As a respondent in the administrative proceedings, Fafer was called upon by the agency to report the "average profit realized on home market/third country sales of the class or kind of merchandise."[10] While the company ultimately responded with regard to Z-type, as well as non-Z-type, product in its home market, the "sales information submitted to Commerce for constructed value purposes was merely a sampling of overall home market sales." Plaintiff's Brief, p. 9. *See also* Plaintiff's Reply, pp. 6–13. The record supports this representation, as well as the representation that Z-type sales in the home market were but a fraction of sales of the other kind of product. How-ever, it does not necessarily follow, as the plaintiff argues, that the relatively few or small Z-type sales were not "in the usual commercial quantities or in the ordinary course of trade" within the meaning of section 1677b(e)(2), *supra.* Indeed, the record which Fafer helped create does not support this thesis. And the court notes in passing that the plaintiff also has not established the existence of any price-quantity correlation so as to bring the statutory definition of "usual commercial quantities"[11] into question. That different products may be sold at different prices does not necessarily establish that the latter are the result of quantity differences. In sum, the court is not persuaded that derivation of profit from all of the products within the class or kind of

8. *Cf.* Plaintiff's Reply, p. 20 ("Fafer's principal brief ... expressed neither agreement[ ] nor disagreement about whether this practice is lawful or appropriate").

9. Plaintiff's Brief, p. 15.

10. Defendants' Confidential Appendix ("ConfApp"), Exhibit 1 (Record Document 29, p. 15). This request was conditioned upon whether or not the company's profit exceeded the statutory minimum 8 percent.

11. 19 U.S.C. § 1677(17).

Fafer's merchandise was not in accordance with law.

 With regard to plaintiff's plea for a proportional al-location of profit, at the time of Fafer's home-market sales, the ITA had authority to construct value by selecting

> appropriate samples and averages...; but such samples and averages shall be representative of the transactions under investigation.[12]

In *Nachi–Fujikoshi Corp. v. United States*, 19 CIT 914, 918, 890 F.Supp. 1106, 1109 (1995), the court reaffirmed that, while the agency had discretion to resort to sampling under the conditions specified in 19 U.S.C. § 1677f–1(a), such sampling could "not be utilized in a manner which produces unrepresentative results." In determining whether the ITA has abused its discretion in its sampling methodology, a court must take into account the precise circumstances of each case. *NTN Bearing Corp. of America v. United States*, 997 F.2d 1453, 1458 (Fed.Cir. 1993). Those at bar do not reflect direct agency resort to "generally recognized sampling techniques" within the meaning of 19 U.S.C. § 1677f–1(a) (1993). Rather, respondent Fafer submitted the samples of its home-market business, but the ITA was not at liberty to blindly accept them. *Cf. INA Walzlager Schaeffler KG v. United States*, 21 CIT ——, ——, 957 F.Supp. 251, 273 (1997). As this and other courts have held, the agency's authority under the Trade Agreements Act of 1979, as amended, is "subject to a rational relationship between data chosen and the matter to which they are to apply." *Manifattura Emmepi S.p.A. v. United States*, 16 CIT 619, 624, 799 F.Supp. 110, 115 (1992). *See, e.g., D & L Supply Co. v. United States*, 113 F.3d 1220 (Fed.Cir.1997); *Sigma Corporation v. United States*, 117 F.3d 1401, 1410–12 (Fed.Cir.1997). While these cases involved judicial review of ITA enforcement of different sections of the statute, this court is not persuaded that the principle(s) enunciated therein are inapposite to this case

where the agency had clear discretion to construct value pursuant to 19 U.S.C. § 1677b(e) (1993), but not to such a degree of distortion of the record as presented herein. *Cf. Torrington Company v. United States*, 21 CIT ——, ——, 969 F.Supp. 1332, 1335 (1997).

Hence, this court must confirm plaintiff's complaint that its home-market profit on Z-type product has become extrapolated out of realistic and rational proportion. Perhaps the simple reason for this, as the court has concluded above, is the ministerial nature of the ITA's approach,[13] which may well have been all that was permissible, given its timing.

### III

Whatever the reason for the distortion contested herein, the court concludes in light of the foregoing that plaintiff's motion for judgment on the agency record must be granted, and the 13.31 weighted-average margin percentage reported for FFC at 58 Fed.Reg. 44,164 must be, and it hereby is, vacated.

The ITA may have 45 days from the date hereof to consider and report whether, in the exercise of its sound discretion, factoring plaintiff's profit on home-market sales of Z-type product in a manner more reflective of the record leads to a weighted-average margin percentage greater than the 3.65 reported at 58 Fed.Reg. 37,091 for FFC. If the court does not receive an affirmative report to this effect by the end of this period, that original margin will be affirmed.

So ordered.

---

**12.** 19 U.S.C. § 1677f–1(b) (1993). This subsection, which was adopted in the Trade and Tariff Act of 1984, Pub.L. No. 98–573, § 620(a), 98 Stat. 2948, 3039, was amended by the Uruguay Round Agreements Act, Pub.L. No. 103–465, § 229(a), 108 Stat. 4809, 4889 (1994).

**13.** *Cf.* Defendants' ConfApp, Exhibit 4 (Confidential Document 159).